UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SERGIO BARNES,

                         Plaintiff,

              v.

DR. EDWIN UZU, et al.,

                         Defendants.

No. 20-CV-5885 (KMK)

OPINION & ORDER

---

Appearances:

Sergio Barnes
Woodbourne, NY
*Pro Se Plaintiff*

Brendan M. Horan, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Sergio Barnes ("Plaintiff"), proceeding pro se, brings this Action pursuant to 42 U.S.C.

§ 1983 and state law against Defendants Dr. Edwin Uzu ("Dr. Uzu"), Dr. Robert Bentivegna

s/h/a Ventimegna ("Dr. Bentivegna"), Deputy Commissioner Dr. Carl Koenigsmann s/h/a

Koenigsman ("Dr. Koenigsmann"), Nurse Aileen McCarthy ("Nurse McCarthy"), Nurse

Administrator Leslie Carey ("NA Carey"), and Dr. Abdul Akhand s/h/a Ahmad Akhan

("Dr. Akhand"; collectively, "Defendants"), alleging that Defendants were deliberately

indifferent to his serious medical needs and committed medical malpractice. (*See* Am.

Complaint ("AC") 5 (Dkt. No. 9).)[1, 2]  Before the Court is Defendants' Motion To Dismiss the

Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Not. of

Mot. (Dkt. No. 23).)

For the reasons stated herein, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Complaint and are assumed to be true for

the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y.*

*Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven").  (AC

2.)  Plaintiff injured his Achilles Tendon on September 10, 2016, while playing football.  (*Id.* at

5.)  Following this injury, two unnamed nurses escorted him to the facility's medical department.

(*Id.* at 11.)  Nurse McCarthy then took Plaintiff's vitals and examined him.  (*Id.* at 5.)  Plaintiff

thereafter stayed in the infirmary over the weekend until Dr. Uzu examined him on

September 12, 2016.  (*Id.* at 11, 22.)

During this examination, Plaintiff told Dr. Uzu that his "pain wasn't that severe" but that

he "was unable to place weight on the ball of [his] foot."  (*Id.* at 11.)  Plaintiff also requested

Dr. Uzu order an MRI for Plaintiff.  (*Id.* at 23.)  Plaintiff alleges that Dr. Uzu incorrectly

diagnosed Plaintiff with a strained tendon and only ordered that an x-ray image be taken of his

---

[1] Because the AC does not use consistent pagination, and because it is broken up into a
form portion as well as several attached exhibits, the Court refers simply to the ECF-stamped
pages in the top-right corner.

[2] Plaintiff has misspelled these names in his Complaint, and the Court refers to the correct
spellings used in Defendants' Memorandum.  (*See* Defs.' Mem of Law in Supp. of Mot. ("Defs.'
Mem.") 1 (Dkt. No. 24).)

lower leg.  (*Id.* at 11, 23, 34, 38.)  Plaintiff also alleges that Dr. Uzu refused Plaintiff's request

for a pair of crutches to help him walk in light of the pain he was experiencing because Dr. Uzu

felt it "wasn't necessary."  (*Id.* at 23; *see also id.* at 11.)

Pursuant to Dr. Uzu's order, Plaintiff alleges that x-rays were taken on September 18,

2016, and revealed no broken bones or other injuries.  (*See id.* at 23; *see also id.* at 31–32.)

Three days after the x-ray was taken, Plaintiff wrote a letter to the "Medical Department,"

specifically copying NA Carey, recounting the events leading up to and following his injury and

complaining about continued pain and stiffness.  (*Id.* at 38.)  Moreover, he specifically wrote in

this letter that "[t]he stiffness in the [A]chilles area has not subsided in the least, the pain is still

at the same intensity, and flexion of the calf muscle is still non-functional."  (*Id.*)  For that

reason, Plaintiff wrote, he "ha[d] reason to believe that something is torn."  (*Id.*)  Accordingly,

he requested "a thorough examination as soon as possible."  (*Id.*)

Approximately one week later, on September 27, 2016, Plaintiff visited sick call once

more and spoke with an unidentified nurse, again complaining about "persistent weakness in

[his] right leg," an inability "to bear weight on the ball of [his] food," and growing pain verging

on "unbearable" levels.  (*Id.* at 23.)  Plaintiff does not detail any change in treatment following

this visit.

On October 6, 2016, Plaintiff again visited sick call to reiterate his complaints and

concerns.  (*Id.*)  He made yet another overture for an MRI, (*see id.*), which was subsequently

ordered by Dr. Bentivegna, (*see id.* at 47 (listing "Bentivegna, Robert" as the "Ordering

Physician").)  An orthopedic consultation was also scheduled.  (*See id.* at 29 (noting in the

"Provider Orders" that Plaintiff "has ortho appt. sched.").)  Documentation from the consult

suggests that the referral was made by Dr. Akhand.  (*See id.* at 42 (listing Dr. Akhand as the doctor who referred Plaintiff).)

An MRI of Plaintiff's Achilles Tendon was taken on November 14, 2016, at Putnam hospital.  (*See id.* at 47.)[3]  The MRI report showed a "severe tear of the Achilles [T]endon."  (*Id.*)  The report goes on:

> The tear extends obliquely through the tendon, spanning a length of approximately 6.0 cm, either completely or nearly completely disrupting the tendon.  It is difficult to discern any traversing intact fibers at the distal aspect of the tear.  Fluid is noted within the tear.  The tendon above and below the tear is thickened, with abnormal intrasubstance signal.

(*Id.*; *see also id.* at 42 (noting a "severe tear of the right Achilles tendon . . . either completely or nearly completely disrupting the tendon").)

On or around November 21, Plaintiff wrote to Dr. Akhand, copying NA Carey, requesting the results of his MRI.  (*See id.* at 53 (writing that "[i]t's been almost 7 days" since the MRI).)  Dr. Akhand then informed Plaintiff that he had an "orthopedics appointment at Mount Vernon Hospital on [November 29, 2016]."  (*Id.*)  Dr. Akhand then stated: "Possible surgical repair very soon."  (*Id.*)

On November 29, 2016, Dr. Jonathan Holder of Mount Vernon Hospital examined Plaintiff and referred Plaintiff for surgery.  (*See id.* at 42.)

Notwithstanding this diagnosis, Plaintiff was not provided with crutches or another assisted walking device following the MRI, but was still "forced to <u>walk</u> to each location, painfully navigate numerous staircases, or be punished by [Green Haven's] staff via misbehavior

---

[3] Plaintiff alleges that the MRI was taken on November 29, 2016, (*see* AC 6), but the medical records Plaintiff attached to the AC show the images were taken on November 14, 2016, (*id.* at 47).

report (which would ha[ve] resulted in loss of all privileges, etc.)." (*Id.* at 5 (emphasis in original).)

Dr. Holder ultimately operated on Plaintiff on March 7, 2017, 178 days after the initial injury. (*Id.* at 43; *see also id.* at 6, 50.) Following surgery, Plaintiff had a cast placed on his ankle, (*see id.* at 43), and was provided with crutches, (*see id.* at 6). Approximately two weeks after the surgery, on March 23, 2017, Plaintiff had his cast and dressing changed. (*See id.* at 43.)

On April 13, 2017, Dr. Holder removed Plaintiff's cast. (*See id.* at 44; *see also id.* at 12.) Dr. Holder also requested that Plaintiff begin physical therapy to strengthen the tendon and its surrounding muscles "ASAP." (*Id.* at 44; *see also id.* at 12.) Dr. Akhand "reviewed" the consult on [April 21, 2017]." (*Id.* at 12.) Nearly a week and a half later, "the consult requesting physical therapy was entered in the FHS1 system on [May 4, 2017,] and his appointments began soon after." (*Id.*) Specifically, Plaintiff's physical therapy evaluation was performed on May 8, 2017. (*Id.* at 17.) Thereafter, Plaintiff "completed 17 physical therapy sessions between [May 16, 2017], and [August 22, 2017]." (*Id.*)

Plaintiff has previously filed two grievances through the New York State Department of Corrections and Community Supervision ("DOCCS") on April 28 and May 1, 2017, consolidated at No. GH-86385-17. (*See id.* at 9–10.) Plaintiff's first grievance pertained to the delay in his diagnosis and treatment. (*See id.* at 9.) Plaintiff's second grievance pertained to the delay in ordering his physical therapy. (*See id.* at 10.)

Plaintiff received a favorable resolution for his second grievance from the Inmate Grievance Resolution Committee ("IGRC"). Specifically, on May 19, 2017, the "IGRC agree[d] with [Plaintiff] as per investigation there was no explanation for consult delay to physical

5

therapy[.]  IGRC recommend[ed] that [Plaintiff] receive adequate medical care and treatment." (*Id.* at 13.)

The Superintendent affirmed the IGRC's recommendation on June 2, 2017. (*Id.*)

Plaintiff appealed his consolidated grievance to the Central Office Review Committee ("CORC") on June 9, 2017.  (*Id.*)  On August 22, 2018, the CORC issued a final decision, which partially accepted Plaintiff's request, noting that since the grievance was filed, Plaintiff "[wa]s receiving appropriate treatment."  (*Id.* at 17.)[4]

Plaintiff avers that this course of events gives rise to, inter alia, the following claims: medical negligence, medical malpractice, dilatory medical treatment, deliberate indifference to pain and suffering, failure to make a rational medical action, and failure to supervise.  (*Id.* at 6.) As a result, Plaintiff seeks relief in the form of compensatory and punitive damages.  (*See id.*)

B.  Procedural Background

Plaintiff's original complaint, (Dkt. No. 2), was delivered to prison officials for mailing to the Court on June 12, 2020, (*see* Order to Amend dated Oct. 14, 2020, at 4 (Dkt. No. 7)).[5] Plaintiff's request to proceed in forma pauperis was granted on September 22, 2020.  (Dkt. No. 6.)  On October 14, 2020, the Court issued an order requiring Plaintiff to amend the

---

[4] Defendants claim that this decision was issued on August 22, 2018.  (Defs.' Mem. 4.) However, the decision is undated.  Instead, the decision only notes that Plaintiff's hearing occurred on August 22, 2018.  Plaintiff avers that he "did not receive his final CORC decision until on or around September of 2018."  (AC 6.)  For reasons expounded upon infra, this subtle discrepancy does not bear on the final holding.

[5] Despite the fact that the Complaint was docketed on July 28, 2020, as explained below, for purposes of any statute of limitations analysis, pro se complaints are considered filed the moment the pleading is first given to a prison official for mailing.  *See Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2019 WL 1447261, at *19 (S.D.N.Y. Mar. 15, 2019) ("Pursuant to the 'prison mailbox rule,' a pro se prisoner's complaint is deemed to be filed when it is delivered to prison officials for transmittal to the court." (italics omitted) (citing *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993))).

complaint to adhere to the relevant pleading standards.  (Dkt. No. 7.)  On December 21, 2021, pursuant to the Court's order, Plaintiff filed the AC.  (Dkt. No. 9.)  The AC added one Defendant, Dr. Koenigsmann.  (*Compare generally* Compl., *with* AC.)

On May 18, 2021, Defendants filed a letter motion with the Court requesting a conference to discuss Defendants' intention to file a motion to dismiss.  (Dkt. No. 20.)  The next day, the Court issued an order terminating the letter motion and setting the deadline for Defendants to file their Motion to Dismiss by no later than June 21, 2021, the deadline for Plaintiff to file a response by no later than July 21, 2021, and the deadline for Defendants to file a reply by no later than August 21, 2021.  (Dkt. No. 21.)

Defendants filed the instant Motion on June 21, 2021.  (Not. of Mot.; Def.'s Mem.)  Plaintiff did not file a response.  In the absence of a response to the Motion from Plaintiff, Defendants did not file a reply.  (*See generally* Dkt.)  "The Court now deems the Motion fully submitted."  *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 7029002, at *2 (S.D.N.Y. Nov. 30, 2020).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555.

     "[O]nce a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if

a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[]

complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

     "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot.*

*Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).  But when a plaintiff proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).  Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

## B.  Analysis

Defendants argue that Plaintiff's claims are untimely; that Plaintiff fails to plausibly allege that Defendants were personally involved in any constitutional violation; that Defendants are entitled to qualified immunity; and that the Court should dismiss any state law claims. (*See generally* Defs.' Mem.)  The Court addresses the arguments as needed.

### 1.  Timeliness

#### a.  Generalized Tolling Law

"[C]laims brought pursuant to § 1983 in New York are subject to a three-year statute of limitations." *Tenemille v. Town of Ramapo*, No. 18-CV-724, 2020 WL 5731964, at *8

(S.D.N.Y. Sept. 24, 2020) (citing *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013)).

"[A]ccrual occurs when the plaintiff knows or has reason to know of the injury which is the basis

of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (quotation marks

omitted), *cert. denied*, 538 U.S. 922 (2003). Accordingly, "[a] claim of deliberate indifference

of medical needs brought under [§] 1983 accrues when medical treatment is denied." *Miles v.

City of New York*, No. 14-CV-9302, 2018 WL 3708657, at *10 (S.D.N.Y. Aug. 3, 2018) (citation

and alteration omitted); *see also Traore v. Police Office Andrew Ali Shield*, No. 14-CV-8463,

2016 WL 316856, at *5 (S.D.N.Y. Jan. 26, 2016) (holding that the plaintiff's two claims accrued

on the two dates he was denied medical treatment because he "was immediately aware of his

injuries when they occurred . . . and was aware that he did not receive treatment when he first

requested it").

While the statute of limitations countdown begins when a claim accrues, there is also the

question of when a plaintiff's complaint is deemed to have been filed. "Pursuant to the 'prison

mailbox rule,' a pro se prisoner's complaint is deemed to be filed when it is delivered to prison

officials for transmittal to the court." *Lehal*, 2019 WL 1447261, at *19 (italics omitted) (citing

*Dory*, 999 F.2d at 682); *see also Walker v. Jastremski*, 430 F.3d 560, 563 (2d Cir. 2005) (noting

that *Dory* "extended the prison mailbox rule to the filing of civil complaints" by pro se litigants),

*cert. denied*, 547 U.S. 1101 (2006); *Nash v. Kressman*, No. 11-CV-7327, 2013 WL 6197087, at

*4 (S.D.N.Y. Nov. 27, 2013) ("For purposes of determining the timeliness of [the] [p]laintiff's

claims and in light of the prison mailbox rule, [the] [p]laintiff's original complaint, filed pro se,

is deemed to have been filed on . . . the date appearing on the cover letter to the complaint, rather

than . . . the date on which the complaint was filed by the [c]ourt." (italics omitted)).

The final question to consider is the extent to which a plaintiff's claims are subject to tolling.  First, statutes of limitations for § 1983 actions are tolled by federal law while a prisoner is pursuing an administrative remedy for his or her claim.  Specifically, the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has made clear that this "language is mandatory: An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 578 U.S. 632, 638 (2016) (quotation marks omitted); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.").  And, importantly, "the PLRA exhaustion requirement applies to all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), including the claims at issue, *see Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same).  Accordingly, "[t]he Second Circuit holds that for claims that must be administratively exhausted under the [PLRA], 'the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process."  *Harris v. Viau*, No. 17-CV-9746, 2019 WL 1978596, at *7 (S.D.N.Y. May 3, 2019) (quoting *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011)); *see also Marshall v. Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *4 (S.D.N.Y. Mar. 22, 2018) ("In the context of prisoner rights litigation, the Second Circuit has recognized that the applicable statute of limitations must 'be tolled while a prisoner completes the mandatory exhaustion process.'" (quoting *Gonzalez*, 651 F.3d at 234)).

11

Second, § 1983 actions may also be tolled where applicable state law provides for tolling. "Federal courts do have the power to toll statutes of limitations borrowed from state law, but only where application of the statute of limitations would frustrate the policy underlying the federal cause of action.  Use of the New York statute of limitations in § 1983 actions does not violate such policy." *Jewell v. County of Nassau*, 917 F.2d 738, 740 (2d Cir. 1990) (citations omitted).  As the Supreme Court made clear, "[b]ecause '§ 1983 claims are best characterized as personal injury actions,' . . . a [s]tate's personal injury statute of limitations should be applied to all § 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240–41 (1989) (quoting *Wilson v. Garcia*, 471 U.S. 261, 280 (1985)).  Therefore, if a state statute or law tolls the state's statute of limitations for personal injury actions, that statute or law would also toll a § 1983 claim arising from the same conduct.

Accordingly, the Court must count the days between the date a given claim accrued and the date Plaintiff delivered the initial complaint to prison officials for mailing, tolling the time when appropriate—i.e. for the duration of time Plaintiff was exhausting his administrative remedies as well as when apposite state law statute of limitations were tolled—to determine whether Plaintiff's claims are timely.

### b.  Tolling the Statute of Limitations: the Grievance Process and Relevant Executive Orders

Plaintiff gave his initial complaint to prison officials for mailing on June 12, 2020.  (AC 27.)  Counting backwards, absent any tolling considerations, the actions giving rise to claims must have occurred on or after June 12, 2017.  However, two distinct sources of tolling play a significant role in this analysis: the grievance process and then-New York Governor Andrew Cuomo's issuance of multiple state executive orders tolling state statutes of limitation.

12

### i.  Grievance Process

As discussed above, the first two denials of treatment (the delay in his diagnosis and treatment) were covered in Plaintiff's first grievance, while the third denial of treatment (the delay in physical therapy) was covered in Plaintiff's second grievance.  (*See* AC 9–13.)  And on May 19, 2017, the "IGRC agree[d] with [Plaintiff] as per investigation there was no explanation for consult delay to physical therapy[.]  IGRC recommend[ed] that [Plaintiff] receive adequate medical care and treatment."  (*Id.* at 13.)  Accordingly, it can be said that Plaintiff "has obtained at least partial favorable relief, and as the Second Circuit has held, where the inmate receives favorable relief there is no basis for an administrative appeal."  *Hairston v. LaMarche*, No. 05-CV-6642, 2006 WL 2309592, at *9 (S.D.N.Y. Aug. 10, 2006) (report and recommendation) (citing *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004)).

But the IGRC's recommendation—and its favorable outcome—applies *only* to Plaintiff's second grievance with regard to the facility's failure to provide him with physical therapy in a timely manner.  The IGRC offered no opinion whatsoever on Plaintiff's first grievance concerning his delay in diagnosis and treatment.  That the IGRC recommendation omitted discussion of this initial grievance has important implications and evinces a failure to follow applicable rules regarding grievance procedures.

The Inmate Grievance regulations allow for "[l]ike grievances" to "be consolidated at the option of the [Inmate Grievance Program ('IGP')] supervisor or IGRC and assigned one grievance calendar number."  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.  However, the language of this provision makes clear that so-called "like grievances" pertain to an instance in which multiple inmates make a complaint regarding the same issue.  Indeed, the provision mandates that "[t]he grievants shall select three or four spokespersons from their number to be

grievants of record and to represent them at the hearing," and that any subsequent related grievance filed while the consolidated grievance is in process must be joined with this consolidated grievance.  *Id.*  The regulation also states that for consolidated "like" grievances, "[a] list of the names of *every inmate* who submitted a complaint on *the issue* shall be included with the grievance materials and submitted with any appeal which may result."  *Id.* (emphasis added).  And the provision makes clear that "all of the grievants" should be notified, but that while every grievant may not be individually told directly, "the three of four grievants of record will."  *Id.*  In light of the provision's language, the consolidation of like grievances contemplates *only* multiple grievances from multiple inmates regarding *one* common wrong.  Put another way, "[t]he regulations simply do not contemplate the situation in which [Plaintiff] found himself," *Williams v. Correction Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016), wherein a prisoner pursues two grievances on two separate tracks, receives a response from the IGRC that only substantively addresses (and grants) only one of them, and attempts to simultaneously appeal both to the CORC to properly exhaust.

The Court is not aware of any apposite Second Circuit precedent regarding how district courts are to parse mixed results from related grievances that speak to different wrongs, nor is it aware of analogous situations in which the grievance process yielded only partial results. However, the Second Circuit has endorsed the language used by the Tenth Circuit, wherein that court stated that an inmate's administrative remedies are only exhausted "'[o]nce a prisoner has won *all* the relief that is available under the institution's administrative procedures.'"  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (emphasis added) (quoting *Ross v. County of*

*Bernalillo*, 365 F.3d 1181, 1187 (10th Cir. 2004)).[6]  Plaintiff's receipt of a decision that

speaks—even favorably—to just one of the two wrongs raised cannot genuinely be described as

Plaintiff having "won all the relief that is available," *Ortiz*, 380 F.3d at 654 (quotation marks

omitted), nor can it be said to be anything but "unsatisfactory," *Woodford*, 548 U.S. at 105.

Rather, this situation is more closely related to one in which Plaintiff did not actually

receive a response from the IGCR.  In such a situation, as other courts in the Second Circuit have

held, "[a]n inmate's failure to appeal a grievance is not excused because he has received no

response to his initial grievance." *Arce v. Keane,* No. 01-CV-2648, 2004 WL 439428, at *2

(S.D.N.Y. Mar. 9, 2004); *see also Hernandez v. Coffey,* No. 99-CV-11615, 2003 WL 22241431,

at *4 (S.D.N.Y. Sept. 29, 2003) ("[W]here a prisoner files a grievance, and the IGRC does not

respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and

the CORC").  The obligation to continue the appeals to a CORC decision strongly favors tolling

the statute of limitations in this case until such a decision was rendered.  Therefore, in keeping

with the idea that there exist "nuances in the exhaustion requirement," *Reynoso v. Swezey*, 238 F.

App'x 660, 662 (2d Cir. 2007) (summary order), *cert. denied*, 552 U.S. 1207 (2008), the Court

finds that the date at which Plaintiff's administrative remedies were exhausted must be

bifurcated notwithstanding the consolidation of his grievances. The question, then, of exactly

when each of Plaintiff's administrative remedies was exhausted—and thus when the statute of

limitations clock restarted—involves two distinct inquiries.

With respect to his second grievance, the Court finds that the claim was tolled as a result

of Plaintiff's exhaustion of administrative remedies until the issuance of his initial favorable

---

[6] Relatedly, Justice Stevens, in describing the PLRA's requirements, wrote that "if the
resolution of that grievance is unsatisfactory to [inmates], they must exhaust available
administrative appeals." *Woodford*, 548 U.S. at 105 (Stevens, J., dissenting).

decision on May 19, 2017.  This date is straightforward and in keeping with the longstanding

principle that once an inmate has received favorable relief, there is no basis to file an

administrative appeal.  *Frasier*, 2015 WL 1000047, at *7.[7]   The statute of limitations regarding

Plaintiff's second grievance is therefore tolled 18 days, the difference between when the initial

grievance was filed (May 1, 2017), (*see* AC 9–13), and when Plaintiff received his favorable

decision (May 19, 2017), (*see id.*).

   With respect to Plaintiff's first grievance, however, the tolling due to the exhaustion of

remedies is quite a bit longer.  Again, Plaintiff filed this complaint on April 28, 2017.  (*See id.*)

Plaintiff's remedies were exhausted upon receipt of the final decision from CORC, *see, e.g.*,

*Partee v. Grood*, No. 06-CV-15528, 2007 WL 2164529, at *3 (S.D.N.Y. Jul. 25, 2007) ("[A]n

---

[7] Defendants articulate that the time tolled should be 35 days, representing the time
between when the grievance was filed and when the Superintendent affirmed the decision.  (*See*
Defs.' Mem. 8–10 (collecting cases).)  However, the cases Defendants cite trace back to Judge
Koeltl's decision in *Kaplan v. N.Y. State Dep't of Corr. Servs.*, No. 99-CV-5856, 2000 WL
959728 (S.D.N.Y. July 10, 2000), but that decision undercuts its assert in two ways.
   Specifically, in *Kaplan*, the court observed the following:

> [N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7, a provision that pertains specifically
> to inmates in Special Housing Units, or SHUs,] which provides that "[t]he [IGP]
> *supervisor and/or the superintendent must obtain verification of compliance with*
> *grievance decisions favorable to the inmate*," imposes a duty on prison officials.  It
> does not provide the complaining inmate with further procedural recourse.  Once
> an inmate has obtained a favorable ruling, the inmate has exhausted the available
> administrative remedies.

*Id.* at *3 n.4 (emphasis added).  First, this provision speaks *only* to inmates in special housing
units, or "SHUs."  *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7.  Second, and more
importantly, the *Kaplan* court made the clear distinction between the inmate's receipt of a
favorable outcome and the prison officials' requirement to obtain verification of compliance,
namely that the former satisfies the inmate's exhaustion requirement while imputing the latter on
the inmate as part of the exhaustion requirement would be inappropriate.  *See Kaplan*, 2000 WL
959728, at *3 n.4.  Applying this principle to statutes of limitations considerations, the Court
finds it appropriate to suspend tolling and restart the statute of limitations countdown following a
favorable IGRC resolution, not following the supervisor's affirmance thereof.

16

inmate/plaintiff's claim is not exhausted until he appeals to the CORC and receives a final

decision regarding his grievance"), notwithstanding that it provided no substantive response to

this particular grievance, *cf. Peoples v. Fischer*, No. 11-CV-2694, 2012 WL 1575302, at *6

(S.D.N.Y. May 3, 2012) ("When a prisoner complies with all of the administrative requirements

and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his

grievance in federal court simply because the final administrative decision maker has neglected

to issue a final administrative determination." (alterations and quotation marks omitted)).

Therefore, the Court concludes that the statute of limitations regarding Plaintiff's claim with

respect to this grievance is properly tolled 481 days, the difference between when the initial

grievance was filed (April 28, 2017), (*see* AC 9–13), and when he received the final decision

from CORC (August 22, 2018), (*see id*. at 17).

### ii.  Executive Order

Defendants argue, in broad strokes, that then-Governor Cuomo's Executive Order 202.8

(the "EO") tolling certain state statutes of limitations does not apply to Plaintiff's claims.  (*See*

Defs.'s Mem. 10–11.)  Defendants do not argue this specifically, but the Court presumes that

Defendants' argument extends not only to the original EO but also its successors, which

extended the initial EO's tolling of relevant statutes of limitations.  Determining whether the EO

and its successors (collectively, the "EOs") tolled the statute of limitations on Plaintiffs' claims

is a two-step process.

First, the Court must determine whether the EOs legally tolled the state statute of

limitations in the first place.  New York courts have held that the Executive Orders were legally

sufficient to toll all state statutes of limitations.  *See, e.g., Brash v. Richards*, 149 N.Y.S.3d 560,

561 (App. Div. 2021).  In *Brash*, the Appellate Division reasoned as follows:

> Executive Law § 29-a(1) provides that the Governor "may by executive order temporarily suspend specific provisions of any statute, local law, ordinance, or orders, rules or regulations, or parts thereof, of any agency during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster."  Executive Law § 29-a(2)(d) provides that any such order "may provide for the alteration or modification of the requirements of such statute, local law, ordinance, order, rule or regulation suspended, and may include other terms and conditions."

*Id.* at 562.  Accordingly, the *Brash* court concluded, Governor Cuomo had the authority to toll these statutes of limitations.  *See id.* at 562–63.  And because the EO and most of its successors specifically used the language "toll" with respect to statutes of limitations, and because multiple executive orders confirmed that the tolling period was up on November 3, 2020, the court in *Brash* concluded that Governor Cuomo realized this authority in tolling the statute of limitations for claims under certain state laws.  *See id.* at 563.

Following similar reasoning, other New York courts concluded that the EOs tolled relevant statutes of limitations.  *See, e.g., Foy v. New York*, 144 N.Y.S.3d 285, 288 (Ct. Cl. 2021) ("The executive order makes pointed reference to the Court of Claims Act and is clear in stating that any specific time limit for the commencement of any legal action is tolled"); *Morse v. LoveLive TV US, Inc.*, 135 N.Y.S.3d 629 (table decision), 2020 WL 7380288, at *6–7 (Sup. Ct. Dec. 15, 2020) (denying a motion to dismiss on the basis of timeliness because the EO and its successors tolled the statutes of limitations).  The Court sees no reason why the legal reasoning in *Foy* or *Morse* do not apply to state common law personal injury actions; indeed, between *Brash*, *Foy*, and *Morse*, none implies that the EOs' enforcement power is limited to only certain causes of action.

"This Court is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion."  *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010); *see also Blue Cross & Blue*

18

*Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003) ("[A]s a general matter, '[federal courts] are bound . . . to apply the law as interpreted by New York's intermediate appellate courts . . . unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion.'" (second and third alterations in original) (quoting *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999))).  Absent any evidence that *Brash*, *Foy*, and *Morse* were incorrectly decided, and absent any discernable reason why those cases' holdings would not be extended to personal injury actions, the Court concludes that the EOs have the effect of tolling state common law personal injury actions.

Second, the Court must determine whether the tolling of state law via the EOs bears on this § 1983 action.  Defendants argue it should not, and in support of their argument, Defendants cite to one case in which a court in this district determined that this executive order did not bear on a federal statute of limitations.  (*See* Defs.' Mem. 11 (citing *O'Rourke v. Ehsan Food Corp.*, No. 19-CV-6162, 2020 WL 6894663, at *3 (S.D.N.Y. Nov. 24, 2020)).)  Defendants also make significant hay out of dicta from then-Chief Judge McMahon in *Citi Connect, LLC v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, No. 20-CV-5147, 2020 WL 5940143 (S.D.N.Y. Oct. 7, 2020).  (*See* Defs.' Mem. 10–11.)  In that opinion, Judge McMahon noted that federal courts were not closed during the COVID-19 pandemic.  *See Citi Connect*, 2020 WL 5940143, at *4 ("And unlike the courts in the State of New York, this [c]ourt was not closed to new filings at any time during the pandemic, and no one with authority over the operations [of] this court has ever tolled the running of any statute of limitations.").  Defendants try to stretch her words, asserting that because court closure due to the pandemic was the animating principle behind the EOs' issuance, and because the federal courts—including in this district—were not closed, the

EOs cannot be applied in federal actions.  (Defs.' Mem. 10–11.)  But Defendants effectively concede their argument in the next sentence: "Chief Judge McMahon ultimately ruled that EO 202.8 applied in that matter. . . because the matter was governed by the time limits under the New York State Civil Practice Laws and Rules."  (*Id.* at 11.)

More importantly, however, this case falls closer to *Citi Connect* than it does to *O'Rourke*.  The chief distinction between *Citi Connect* and *O'Roarke* is the source of the relevant statute of limitation.  In *Citi Connect*, the action was commenced pursuant to Section 301 of the Labor-Management Relations Act, but "'[b]ecause Congress did not provide a statute of limitations for suits brought under § 301,' courts in the Second Circuit 'determine[] the statute of limitations for . . . cause[s] of action [under this provision] by looking to the most appropriate state statute of limitations.'"  2020 WL 5940143, at * 3 (first alteration in original) (quoting *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 88 (2d Cir. 1998)).  Conversely, in *O'Rourke*, the case was principally concerned with temporal requirements governed expressly and solely by Federal Rule of Civil Procedure 25, meaning state law regarding statutes of limitations had no bearing on the question.  *See* 2020 WL 6894663, at *2–4.  Indeed, the *O'Rourke* court expressly noted that "*Citi Connect* is inapposite to this case."  *Id.* at *4.

As noted above, "a [s]tate's personal injury statute of limitations should be applied to all § 1983 claims" because such claims are analogous to state personal injury claims.  *Owens*, 488 U.S. at 240–41.  It follows that, because the statute of limitations for personal injury actions in New York is three years, the statute of limitations for § 1983 actions in the Empire State is also three years, *see Hogan*, 738 F.3d at 517, as compared to, for instance, a four-year statute of limitations in Florida, *see Herring v. Dep't of Corr.*, No. 06-CV-85, 2006 WL 1883433, at *1

(N.D. Fla. July 7, 2006) ("The statute of limitations for personal injury actions [in Florida] is four years, and hence the statute of limitations for a claim brought in Florida pursuant to 42 U.S.C. §§ 1981 or 1983 is four years."), or two years in Illinois, *see Walker v. City of Chicago*, — F. Supp. 3d — , 2021 WL 4080770, at *2 (N.D. Ill. Sept. 8, 2021) ("In Illinois, the statute of limitations for § 1983 claims is two years" pursuant to Illinois' state injury statute of limitations).

Because the statute of limitations for § 1983 actions is driven by state law, any statute or executive order that tolls the underlying statute of limitations on state personal injury claims has the effect of tolling the statute of limitations for commensurate § 1983 action. *See Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) ("The Supreme Court has [] held that state tolling rules, like state limitations periods, govern federal actions brought under § 1983 except when inconsistent with the federal policy underlying § 1983." (citing *Bd. of Regents v. Tomanio*, 446 U.S. 478, 485 (1980))); *Mees v. City of New York*, No. 19-CV-7346, 2021 WL 1164300, at *4 (S.D.N.Y. Mar. 25, 2021) ("State tolling law applies to claims under § 1983 so long as that law is not inconsistent with federal law."), *reconsideration denied*, 2021 WL 3500866 (S.D.N.Y. Aug. 9, 2021); *Daniels v. Doe*, No. 99-CV-2192, 1999 WL 1211824, at *2 (S.D.N.Y. Dec. 17, 1999) ("New York's tolling provisions govern the tolling of the statute of limitations [for § 1983 actions]."); *accord McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988) ("The Supreme Court has held that state tolling rules govern [§] 1983 causes of action except when they are inconsistent with the federal policy underlying [§] 1983."); *B.L. v. Schuhmann*, 380 F. Supp. 3d 614, 645 (W.D. Ky. 2019) ("Courts adopt the tolling provisions that apply to that statute unless they are inconsistent with the federal policy underlying the statute.").

Pursuant to this understanding, the Supreme Court as well as the Second Circuit and district courts therein have refused to toll causes of action where New York state law failed to

toll the underlying state action.  *See, e.g.*, *Tomanio*, 446 U.S. at 486 (refusing to toll statute of limitations for an action under the New York Civil Rights Act because "[n]o section of the law provides . . . that the time for filing a cause of action is tolled during the period in which a litigant pursues a related, but independent cause of action"); *Singleton*, 632 F.2d at 191 (refusing to toll statute of limitations for assault, false arrest, and malicious prosecution because "there is no provision for tolling the time for filing a cause of action during the period when a criminal prosecution is pending against the plaintiff"); *Mees*, 2021 WL 1164300, at *4–5 (refusing to toll statute of limitations for a § 1983 action arising from *Brady* violations because no state law permits tolling in such circumstances); *Lugo v. Milford Mgmt. Corp.*, 956 F. Supp. 1120, 1125 (S.D.N.Y. 1997) (refusing to toll statute of limitations for a § 1983 action while a separate action, albeit related, was pending, because no state law provision tolled statutes of limitations when a related but distinct action is brought).

Applying that principle to this case, the Court finds that the days tolled in Plaintiff's case runs concurrently with "[t]he amount of time covered by the original executive order and all extensions."  *Foy*, 144 N.Y.S.3d at 288.  Governor Cuomo issued the EO on March 20, 2020, and issued extensions through November 3, 2020.  *See id.*; *see also Brash*, 149 N.Y.S.3d at 561–62.  Plaintiff handed his initial complaint to prison officials for mailing to the Court on June 12, 2020.  *See supra* I.B.  Therefore, the statute of limitations was tolled from the date of the first EO through that date, totaling 84 days.

### c. Timeliness Analysis

When incorporating the correct number of days each of Plaintiff's claims were tolled, both of Plaintiff's claims are, in fact, timely.

i.  Plaintiff's First Grievance (Misdiagnosis and Denial of
Assistance)

Plaintiff's first claim accrued on September 12, 2016, the day Dr. Uzu first misdiagnosed

Plaintiff and failed to provide him with walking assistance of any kind.  *See Curtis v. Williams*,

No. 11-CV-1186, 2013 WL 1915447, at *8 (S.D.N.Y. May 9, 2013) (holding that a plaintiff's

§ 1983 claim for deliberate indifference and improper medical treatment began when he became

aware of the improper treatment, not weeks later "when [the] [p]laintiff received his MRI results

and was informed of the misdiagnosis and need for reconstructive surgery" (quotation marks

omitted)).

Adding the 481 days during which Plaintiff was exhausting his administrative remedies,

*see supra* II.B.1.b.i, as well as the 84 days in which the statute of limitations was tolled by the

various EOs, *see supra* II.B.1.b.ii, Plaintiff received a total tolling of 565 days regarding his first

claim.  Accordingly, Plaintiff need only have filed his claims within three years of April 4, 2018,

which is 565 days after the claim accrued, or April 4, 2021.  As stated above, Plaintiff handed his

initial complaint to prison officials for mailing to the Court on June 12, 2020.  *See supra* I.B.

Therefore, Plaintiff's claim with regard to his misdiagnosis is timely.

ii.  Plaintiff's Second Grievance (Physical Therapy)

When Plaintiff's claim for denial of medical care regarding his physical therapy is

somewhat unclear, given a prescription to get treated "ASAP," (AC 12, 44); the period of time

following this prescription does not make clear when, exactly, Plaintiff became aware of his sub-

standard treatment, *see Curtis*, 2013 WL 1915447, at *8.  But, as Defendants persuasively

observe, Plaintiff's second claim "accrued no later than May 1, 2017, when he filed his grievance

regarding that delay, because it is clear that he knew, on that date, of the injury that is the basis

for that claim, as he specifically grieved it."  (Defs.' Mem. 6.)  Adding the 18 days during which

23

Plaintiff was exhausting his administrative remedies as well as the 84 days to account for the EOs, Plaintiff would have had to file his Section 1983 claim by August 11, 2020.  Again, because Plaintiff handed his initial complaint to prison officials for mailing to the Court on June 12, 2020, *see supra* I.B, Plaintiff's claim with regard to his physical therapy is also timely.

### 2.  Personal Involvement & Cognizable Claims

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

> A deliberate indifference claim contains two requirements.  The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious.  The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. This means that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.  Officials need only be aware of the risk of harm, not intend harm.  And awareness may be proven from the very fact that the risk was obvious.

*Id.* (citations and quotation marks omitted).

Each of these elements must be met as to each individual defendant to state a claim.  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id*. at 139 (citation and alterations omitted).  Said otherwise, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege that each of the defendants' actions fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).  The Court reviews each defendant's actions to assess his or her involvement and, subsequently, determine whether a cognizable claim has been pled.

### a.  Dr. Uzu

Defendants assert that the allegations in the AC pertaining to Dr. Uzu speak only to his September 12, 2016, misdiagnosis of Plaintiff's injury and his subsequent denial of Plaintiff's request for crutches.  (Defs.' Mem. 14.)  Defendants are correct that the AC makes clear Dr. Uzu diagnosed Plaintiff in September 2016 and refused his crutches thereafter.  (AC 11, 22–23, 34.)  Specifically, Plaintiff alleges that during this examination:

> Dr. Uzu was made aware that I had no stability when weight was shifted to the ball of my right foot. I suggested further examination should be conducted, such as Magnetic resonance imaging (MRI) to be sure of the extent of the damage that was done to the tendon. However, Dr. Uzu only requested a[n] x-ray. Upon being discharge [sic] from the infirmary, I requested to be issued a pair of crutches to travel from the infirmary back to my housing unit, but Dr. Uzu said that it wasn't necessary though to travel the distance from the clinic to my housing unity would be approximately 100 yards.

(*Id.* at 23.)

The AC does not allege any facts regarding Dr. Uzu's awareness of Plaintiff's pain following his initial diagnosis, as Plaintiff complained to unnamed personnel in between the diagnosis and his subsequent MRI.  (*See id.*)  And following the MRI, the Court agrees with

Defendants' that "[t]here are no other allegations pertaining specifically to [Dr. Uzu] therein." (*Id.*)

To be sure, this constitutes involvement in the first potential set of actions giving rise to an Eighth Amendment claim, namely the misdiagnosis and treatment. However, the AC does not allege that Dr. Uzu was involved in Plaintiff's care following his surgery, let alone involved in his physical therapy. Thus, the Court considers only whether Plaintiff has plausibly alleged a claim against Dr. Uzu for sake of the initial misdiagnosis and treatment—or lack thereof.

"Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). This is because, to meet the subjective prong of an Eighth Amendment violation, a defendant "prison official must have a 'sufficiently culpable state of mind,'" which has been interpreted as one of "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 302–03 (1991)). As a result, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

In practice, this standard means that "[a] 'complaint that a physician has been negligent in diagnosing or treating a [prisoner's] medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *8 (S.D.N.Y. Mar. 29, 2016) (second alteration in original) (quoting *Estelle*, 429 U.S. at 106); *see Harris v. Westchester Cty. Med. Ctr.*, No. 08-CV-1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (holding that allegations of negligent

misdiagnosis, "without more," do not state a cause of action under the Eighth Amendment).
"That is precisely the case in the instant Action." *Melvin*, 2016 WL 1254394, at *8.

"Plaintiff does not . . . allege facts suggesting that the misdiagnosis was intentional or reckless, or that Dr. [Uzu] somehow should have known that his misdiagnosis and associated treatment would cause [P]laintiff to suffer serious pain." *Haynes v. City of New York*, No. 19-CV-1925, 2020 WL 4926178, at *11 (S.D.N.Y. Aug. 20, 2020). To be sure, Dr. Uzu misdiagnosed Plaintiff and secured the wrong diagnostic test, namely an x-ray instead of an MRI. But at most, Dr. Uzu's misdiagnosis and subsequent incorrect treatment "'implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.'" *Randle v. Alexander*, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)); *see also Morrison v. Mamis*, No. 08-CV-4302, 2008 WL 5451639, at *11 (S.D.N.Y. Dec. 18, 2008) (recommending the grant of summary judgment in favor of defendant prison doctor in deliberate indifference claim because the plaintiff could not show the doctor was mentally culpable when the doctor ordered an x-ray and the plaintiff "present[ed] no evidence that an MRI is essential where x-rays . . . are used instead"), *report and recommendation adopted*, 2009 WL 2168845 (S.D.N.Y. July 20, 2009); *Abdus-Samad v. Greiner*, 158 F. Supp. 2d 307, 314 (S.D.N.Y. 2001) (granting a motion to dismiss in favor of prison nurse where the plaintiff's complaint "is devoid of allegations concerning any specific conduct of [the] [d]efendant . . . that could establish that she acted with deliberate indifference," having alleged only that the nurse saw the plaintiff after his ankle injury occurred and that she as well as a co-defendant doctor referred the plaintiff for x-ray and not MRI); *Vento v. Lord*, No. 96-CV-6169, 1997 WL 431140, at *5 (S.D.N.Y. July 31, 1997) (dismissing a claim of deliberate indifference against a prison

doctor where the plaintiff alleged only that the doctor denied a request to obtain an x-ray for the plaintiff); *cf. Estelle*, 429 U.S. at 109 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment.").

Plaintiff does not allege an instance in which Dr. Uzu was specifically made aware of his initial misdiagnosis and then purposefully failed to remedy his incorrect view.  For example, Plaintiff alleges no facts to plausibly claim that Dr. Uzu "refused to verify underlying facts that [he] strongly suspected to be true, or declined to confirm inferences of risk that [she] strongly suspected to exist." *Farmer,* 511 U.S. at 843 n.8.  Further, while Plaintiff was denied crutches pursuant to Dr. Uzu's potentially negligent misdiagnosis, this is a far cry from, for instance, "taking away one of his crutches" so as to aggravate his condition, which the Second Circuit has held as potentially adequate to state a "sufficiently culpable state of mind." *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir. 1998).

Instead, "[t]he law is clear . . . that misdiagnosis and 'the decision not to treat based on an erroneous view that the condition is benign or trivial' do not constitute deliberate indifference to Plaintiff's serious medical needs." *Williams v. Williams*, No. 13-CV-3154, 2015 WL 568842, at *6 (S.D.N.Y. Feb. 11, 2015) (quoting *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir. 2000)); *see also Abdus-Samad*, 158 F. Supp. 2d at 314.

In sum, Plaintiff, at most, pleads "allegations of negligent misdiagnosis" against Dr. Uzu, but such allegations "do not suggest that [Dr. Uzu] acted with a conscious disregard to [Plaintiff's] health or safety." *Williams*, 2015 WL 568842, at *7; *see also Melvin*, 2016 WL 1254394, at *6–10 (dismissing deliberate indifference claims against various individual

defendants for failure to state a claim relying upon a failure to state facts "from which to infer

deliberate indifference"); *Martinez v. Ravikumar*, 616 F. Supp. 2d 455, 459 (S.D.N.Y. 2009)

("[The plaintiff] does not allege that [the defendant] knew of and disregarded an excessive risk to

her health and safety while conducting the surgery . . . .  Rather, she alleges that [the

defendant's] treatment and diagnoses were not effective.  At most, [the plaintiff] alleges that [the

defendant] was negligent in his [treatment].  Such allegations do not give rise to a valid claim of

medical mistreatment under the Eighth Amendment.").  Thus, the AC fails to state a claim

against Dr. Uzu, and Defendants' Motion with respect to claims against him is granted.

### b.  Dr. Bentivegna

Defendants aver that Dr. Bentivegna is "only reference[d] in the AC [via] an attached

medical record indicating that he was the individual who ordered Plaintiff's MRI."  (Defs.'

Mem. 13 (citing AC 47–48).)  Curiously, though, Defendants concede in a footnote that,

notwithstanding their use of the word "only," Dr. Bentivegna did in fact correspond with

Plaintiff in January 2018.  (*Id.* at 13 n.5 (citing AC 56).)  Further, Defendants claim that "AC

does not even allege that Dr. Bentivegna examined Plaintiff."  (*Id.* at 13.)  But the documents

attached to Plaintiff's Amended Complaint tell a slightly different story; medical records show

that Dr. Bentivegna in fact reviewed the consultation reports produced by Dr. Holder at Mt.

Vernon Hospital.[8]  (*See* AC 42 (listing Dr. Bentivegna as having reviewed the report); *id.* at 43

---

[8] The medical records in question, along with all of the grievance records, were attached
to the AC.  (*See* AC 28–56.)  As the Second Circuit has held—in the context of a deliberate
indifference claim, no less—"[o]n a motion to dismiss, the [district] court may consider facts set
forth in exhibits attached as part of the complaint as well as those in the formal complaint itself."
*Chance v. Armstrong*, 143 F.3d 698, 700 n.1 (2d Cir. 1998); *see also Halebian v. Berv*, 644 F.3d
122, 130 n.7 (2d Cir. 2011) ("There are exceptions to Rule 12(b)(6)'s general prohibition against
considering materials outside the four corners of the complaint.  For example, it is well
established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the
court may also rely upon 'documents attached to the complaint as exhibits[] and documents

(same); *id.* at 44 (same); *id.* at 45 (same).)  Therefore, it cannot be said that Dr. Bentivegna was not involved in Plaintiff's care, notwithstanding that he may not have examined Plaintiff himself. Nevertheless, Defendants are correct that the AC fails to plead a cognizable claim of deliberate indifference to serious medical needs against Dr. Bentivegna.

The facts pled show only that Dr. Bentivegna was aware of Plaintiff's condition prior to his ordering Plaintiff's MRI.  Accordingly, Plaintiff fails to allege how Dr. Bentivegna was "actually aware of [the] substantial risk" at issue via a misdiagnosis, *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)), before remedying that very misdiagnosis, securing the very treatment Plaintiff requested, and helping Plaintiff obtain relief via surgery thereafter.  This is the opposite of "a 'sufficiently culpable state of mind.'"  *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).

Additionally, the AC fails to allege any facts pertaining to Dr. Bentivegna with respect to Plaintiff's physical therapy.  Dr. Bentivegna's correspondence with Plaintiff may have concerned Plaintiff's physical therapy, but the Court cannot be sure.  Plaintiff attached an undated letter to Dr. Akhand that is presumably from late April 2017.[9]  (AC 54.)  Plaintiff's next exhibit is the next and final mention of Dr. Bentivegna, namely his January 11, 2018, correspondence with Plaintiff in which he says he "received [Plaintiff's] undated letter, as well as [Plaintiff's] identical letter to Dr. Akhand."  (AC 56.)  By the date of this letter, Plaintiff had already received

---

incorporated by reference in the complaint.'" (alteration in original) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *Ibarzabal v. Morgan Stanley DW, Inc.*, No. 07-CV-2273, 2007 WL 9753006, at *1 (S.D.N.Y. Dec. 5, 2007) ("When considering a motion to dismiss for failure to state a claim, a district court may consider the facts as set forth in the complaint, documents attached to the complaint, and any other documents incorporated in the complaint by reference."), *aff'd*, 333 F. App'x 605 (2d Cir. 2009).

[9] *See supra* n.10.

substantial physical therapy.  (*See id.* at 17 (noting Plaintiff's receipt of 17 physical therapy sessions from May 16, 2017 to August 22, 2017).)  Thus, the AC failed to plead that Dr. Bentivegna was "actually aware of" the delay in Plaintiff's physical therapy, *Nielsen*, 746 F.3d at 63 (quotation marks omitted), let alone acted with recklessness or deliberate indifference thereof to contribute to or exacerbate said delay.

Accordingly, the AC fails to state a claim for deliberate indifference against Dr. Bentivegna.  *See Melvin*, 2016 WL 1254394, at *6–10 (dismissing deliberate indifference claims against various individual defendants for failure to state a claim relying upon a failure to state facts "from which to infer deliberate indifference"); *Williams*, 2015 WL 568842, at *7 (dismissing claims of deliberate indifference because the facts alleged in the pleadings "do not suggest that the defendant acted with a conscious disregard to inmate health or safety"); *Harris*, 2011 WL 2637429, at *3 (granting a motion to dismiss because plaintiff failed to allege facts showing defendants' mental culpability).  Defendants' Motion with respect to claims against Dr. Bentivegna is granted.

### c.  Dr. Koenigsmann

The AC fails to allege anything about how Dr. Koenigsmann was involved in the incidents underlying his claims.  "Failing to name a defendant outside the caption of the complaint is grounds for dismissal."  *Price v. Koenigsmann*, No. 19-CV-4068, 2020 WL 4274079, at *4 (S.D.N.Y. July 24, 2020) (collecting cases).  And, the Court agrees, "with respect to Dr. Koenigsmann, the AC contains no allegations whatsoever."  (Defs.' Mem. 12.)  Thus, any complaints against Dr. Koenigsmann are dismissed for lack of personal involvement, and Defendants' Motion with respect to Dr. Koenigsmann is granted.  *Price*, 2020 WL 4274079, at *4; *see also Mercedes v. Westchester County*, No. 18-CV-4087, 2019 WL 1429566, at *5

(S.D.N.Y. Mar. 29, 2019) (dismissing defendants who were not alleged to have participated in, inter alia, any alleged constitutional violations regarding medical care (collecting cases)); *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *3 (S.D.N.Y. July 25, 2014) (dismissing the plaintiff's § 1983 claims against certain defendants whose names appeared only in the caption of the complaint and on the list of all defendants); *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 353–54 (S.D.N.Y. 2014) (dismissing claims against a defendant where the plaintiff failed to satisfy his burden to allege that the defendant "was personally involved in the deprivation of his rights").

### d.  Nurse McCarthy

The AC also fails to allege a claim against Nurse McCarthy for deliberate indifference. The Court agrees with Defendants that "[t]he AC [merely] alleges that Nurse McCarthy provided Plaintiff's initial treatment following the football injury, but does not allege anything more with respect to her personal involvement in Plaintiff's medical care."  (Defs.' Mem. 13.)  Pursuant to these narrow facts, the claims against Nurse McCarthy must be dismissed.

Nurse McCarthy's entire involvement preceded the alleged indifference at issue, meaning she could not possibly be "actually aware of [the] substantial risk" at issue.  *Nielsen*, 746 F.3d at 63 (quotation marks omitted); *see also Patterson v. Lilley*, No. 02-CV-6056, 2003 WL 21507345, at *4 n.3 (S.D.N.Y. June 30, 2003) ("[The defendant prison nurse] could only be held deliberately indifferent to an existing, serious medical condition, not a speculative, future medical injury.  The requisite culpable state of mind would necessarily be absent for the unknown, future injury.").  Moreover, Plaintiff failed to allege that Nurse McCarthy, even if put on notice of Plaintiff's misdiagnosis, "had authority to make such medical decisions" pertaining to Plaintiff's resulting treatment.  *Melvin*, 2016 WL 1254394, at *6 (citing *Jacoby v. County of*

*Oneida*, No. 05-CV-1254, 2009 WL 2971537, at *4 (N.D.N.Y. Sept. 11, 2009)).  Therefore,

"[t]he claim of deliberate indifference is not plausible as to [Nurse McCarthy], given [her]

limited role[] early in [Plaintiff's] treatment," *Lloyd v. Lee*, 570 F. Supp. 2d 556, 569–70

(S.D.N.Y. 2008), as well as a failure to allege a culpable mindset, *see Abdus-Samad*, 158 F.

Supp. 2d at 314 (dismissing claim against nurse where complaint "is devoid of allegations

concerning any specific conduct of [the] [d]efendant . . . that could establish that she acted with

deliberate indifference," having alleged only that the nurse defendant saw plaintiff after his ankle

injury occurred and that she and defendant doctor referred plaintiff for x-ray and not MRI).  As a

result, Defendants' Motion with respect to Nurse McCarthy is granted.

<u>e.  NA Carey</u>

Plaintiff similarly fails to state a claim against NA Carey.  NA Carey's involvement in

Plaintiff's care is as follows: Plaintiff sent a letter on September 21, 2016, copying the "Chief

Nurse Administrator" asking for a "thorough examination," (AC 38); NA Carey responded on

October 6, 2016, saying his concerns have been addressed, (*id.* at 39); Plaintiff replied to NA

Carey's letter three days later saying that his concerns had not been addressed and that he was in

need of "an MRI in the near future," (*id*. at 40); and, NA Carey was copied on Plaintiff's note to

Dr. Akhand requesting the results of his MRI, (*id.* at 53).

In the first instance, albeit in a different context, "[t]he Second Circuit has held that

letters to and from an official do not meet the requisite level of personal involvement necessary

to state a claim under § 1983."  *Hodges v. Wright*, No. 10-CV-0531, 2011 WL 5554866, at *6

(N.D.N.Y. Sept. 29, 2011) (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)), *report and

recommendation adopted*, 2011 WL 5554880 (N.D.N.Y. Nov. 15, 2011).  That alone strongly

suggests that Plaintiff cannot state a claim against NA Carey given her lack of personal involvement in his treatment.

Even if the Court were to consider her sufficiently involved, the facts pled still do not plausibly state that NA Carey was deliberately indifferent to Plaintiff's pain.  Rather, they suggest that she was instead of the opinion that Plaintiff's concerns were being addressed via the MRI scheduled by Dr. Bentivegna.  As the Second Circuit has previously opined, "[a]t most," an allegation that a nurse "should not have deferred to [a treating physician] amounts to an allegation of negligence.  But negligence is not deliberate indifference."  *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (affirming summary judgment).

Finally, as was the case for Nurse McCarthy, Plaintiff failed to allege any facts to show NA Carey had the authority to modify Plaintiff's treatment.  *See Melvin*, 2016 WL 1254394, at *6 (stating that the plaintiff failed to allege a nurse had the requisite mental culpability because the plaintiff failed to allege that the nurse "even had authority to make such medical decisions" necessary to remedy the alleged deliberate indifference (citing *Jacoby*, 2009 WL 2971537, at *4)).

Given Plaintiff's failure to allege NA Carey's involvement, mental culpability, or authority to modify his treatment, Plaintiff fails to state a claim of deliberate indifference against NA Carey, and Defendants' Motion with regard to said claim is granted.

### f.  Dr. Akhand

Lastly, Plaintiff's allegations against Dr. Akhand similarly fall short.  The AC and its attached exhibits fail to allege how, if at all, Dr. Akhand was involved in Plaintiff's treatment prior to him receiving his MRI.  The Court instead agrees with Defendants' reading of the facts pled:

> [T]he AC does not allege that Dr. Akhand was even involved in Plaintiff's medical care or decision making until after Plaintiff's MRI was taken. Indeed, the first mention of Dr. Akhand appears to be when Plaintiff wrote to him and cc'd Nurse Administrator Carey requesting to know the results of his MRI.

(Defs.' Mem. 17.) Put differently, there is no evidence that Dr. Akhand "somehow should have known" that Plaintiff's earlier "misdiagnosis and associated treatment would cause [P]laintiff to suffer serious pain" prior to the issuance of the MRI report and Dr. Akhand's involvement. *Haynes*, 2020 WL 4926178, at *11.

Once Dr. Akhand was made aware of Plaintiff's condition, per the facts pled in the AC, his actions do not evince a culpable mental state. Dr. Akhand referred Plaintiff to a specialist. (*See* AC 42 (listing Dr. Akhand as the doctor who referred Plaintiff).) This alone is fatal to Plaintiff's claim that Dr. Akhand was deliberately indifferent to his medical needs. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) (dismissing claims of deliberate indifference where prisoner was referred to a specialist by defendant, prison doctor); *Amaker v. Coombe*, No. 96-CV-1622, 2002 WL 523388, at *7 (S.D.N.Y. Mar. 29, 2002) (granting summary judgment for multiple defendants where they referred plaintiff-prisoner to specialists). Indeed, courts in the Second Circuit have held that a delay, or even an outright failure, to refer an inmate to a specialist does not give rise to a deliberate indifference claim. *See Singletary v. Russo*, 377 F. Supp. 3d 175, 188 (E.D.N.Y. 2019) (holding, on a motion for summary judgment, that "a reasonable jury could not find that a one-month delay in referring [the plaintiff] to a specialist constituted a deprivation of adequate medical care"); *Smalls v. Wright*, No. 16-CV-02006, 2018 WL 3581695, at *4 (D. Conn. July 25, 2018) (holding, on a motion for summary judgment, that in failing to refer the inmate-plaintiff to a specialist, "[a]t worst, [the defendant's] treatment decisions following his review of the July and October 2016 X-rays were negligent or medical malpractice, but not the basis for an Eighth Amendment claim of deliberate[]

indifference"), *aff'd*, 807 F. App'x 124 (2d Cir. 2020); *see also Sonds*, 151 F. Supp. 2d at 312 (dismissing claims of deliberate indifference to medical needs because misdiagnoses or "disagreements over . . . the need for specialists . . . are not adequate grounds for a [§] 1983 claim.  Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment").

Following this referral, Plaintiff was scheduled for surgery and then operated upon. Thereafter, the AC does not point to Dr. Akhand specifically as having been involved in Plaintiff's care, including in Plaintiff's physical therapy.  Rather, as stated above, Plaintiff sent an undated letter to Dr. Akhand (likely in late April or May 2017), inquiring why he has not received physical therapy two weeks after his cast is removed.  (*See* AC 54.)[10]  The AC does not, however, allege that Dr. Akhand received said letter, let alone responded to it; rather, the next and final instance in which the AC mentions Dr. Akhand is when Dr. Bentivegna seemingly responds to Plaintiff—albeit months later in January 2018—stating that he received the letter Plaintiff sent to himself and its duplicate, which Plaintiff sent to Dr. Akhand, and that Dr. Akhand is no longer employed at the facility.  (*See* AC 56.)  Thus, as was the case with Dr. Bentivegna, the AC failed to plead with sufficient detail that Dr. Akhand was "actually aware of" the delay in Plaintiff's physical therapy, *Nielsen*, 746 F.3d at 63 (quotation marks omitted), let alone acted with recklessness or deliberate indifference thereof to contribute to or exacerbate said delay.

Having failed to allege facts purporting to show Dr. Akhand's mental culpability, the AC fails to plead a claim against Dr. Akhand.  *See Melvin*, 2016 WL 1254394, at *6–10 (dismissing

---

[10] Based on the IGRC statement, Plaintiff apparently had his cast removed on April 13, 2017.  (*See* AC 12.)  Accordingly, the letter was likely sent on or around April 27, 2017.

deliberate indifference claims against various individual defendants for failure to state a claim

relying upon a failure to state facts "from which to infer deliberate indifference"); *Williams*,

2015 WL 568842, at *6 (dismissing claims of deliberate indifference because the facts alleged in

the pleadings "do not suggest that the defendant acted with a conscious disregard to inmate

health or safety"); *Harris*, 2011 WL 2637429, at *3 (granting a motion to dismiss because a

plaintiff failed to allege facts showing the defendants' mental culpability); *Burgess v. County of

Rensselaer*, No. 03-CV-652, 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006) ("[A] claim of

misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is

not cognizable under [§] 1983." (citation omitted)).

### 3.  State Law Claims

"Finally, to the extent Plaintiff seeks to assert state law claims [arising out of the events

at issue], they are barred by New York Correction Law § 24, which provides that '[n]o civil

action shall be brought in any court of the state . . . against any officer or employee of

[DOCCS] . . . in his or her personal capacity, for damages arising out of any act done or the

failure to perform any act within the scope of employment and in the discharge of duties by such

officer or employee.'" *McCray v. Lee*, No. 16-CV-1730, 2021 WL 4392280, at *11 (S.D.N.Y.

Sept. 24, 2021) (alterations in original) (quoting N.Y. Corr. Law § 24); *Gunn v. Ayala*, No. 20-

CV-840, 2021 WL 5647795, at *8 (S.D.N.Y. Dec. 1, 2021) (same); *see also Baker v. Coughlin*,

77 F.3d 12, 15 (2d Cir. 1996) (holding that § 24 applies to claims in federal court).  "Courts in

the Second Circuit have long held that [§] 24 precludes a plaintiff from raising state law claims

in federal court against state employees in their personal capacities for actions arising within the

scope of their employment." *Davis v. McCready*, 283 F. Supp. 3d 108, 123–24 (S.D.N.Y. 2017)

(collecting cases).  New York Corrections Law § 24 applies here, given that the actions in

question "arose as a result of [Defendants] discharging [their] duties as correctional officers."
*McCray*, 2021 WL 4392280, at *11 (quoting *Boyd v. Selmer*, 842 F. Supp. 52, 57 (N.D.N.Y. 1994)).  Finally, there is no refuge in the New York State constitution, which does not create a private right of action "where . . . remedies are available under § 1983."  *Id.* (alteration in original) (quoting *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013)).  Therefore, the Court grants Defendants' Motion with respect to all claims Plaintiff makes sounding in state law.

## III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted.  Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice.  *See Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").  Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein.  The amended complaint will replace, not supplement, the complaint currently before the Court.  It therefore

must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider.  If

Plaintiff fails to abide by the 30-day deadline, this Action could be dismissed with prejudice.

 The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt.

No. 23), and to mail a copy of this Opinion & Order to Plaintiff's address listed on the docket.

SO ORDERED.

Dated: March 15, 2022
   White Plains, New York

                _____

                KENNETH M. KARAS
               United States District Judge